UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------X
ERIC A. ELLIOTT (p/k/a FLY
HAVANA),

                    Plaintiff,

          - against –

JOSEPH ANTHONY CARTAGENA (p/k/a
FAT JOE), et al.,

                    Defendants.

------------------------------X

**MEMORANDUM AND ORDER**
19 Civ. 1998 (NRB)

**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**

    Plaintiff Eric A. Elliott ("Elliott") alleges that he co-created the hit song "All The Way Up" (the "song") but was not properly credited or compensated for his contributions.  Elliott's amended complaint ("AC") includes four claims pursuant to the Copyright Act of 1976, 17 U.S.C. § 101, _et seq._, (the "Copyright Act"), and ten state law claims.  ECF No. 205, AC ¶¶ 215-348.[1]

    Defendants move to dismiss all of plaintiff's claims.  ECF No. 216.[2]  Defendants assert that even if Elliott's allegations

---

[1]    Plaintiff's ten state law claims include (a) accounting (Count V); (b) constructive trust (Count VI); (c) unjust enrichment (Count VII); (d) quantum meruit (Count VIII); (e) conversion (Count IX); (f) moneys had and received (Count X); (g) breach of fiduciary duties (Count XI); (h) negligence (Count XII); (i) fraud/negligent misrepresentation (Count XIII); and (j) civil conspiracy (Count XIV).  AC ¶¶ 280-348.

[2]    Plaintiff has sued twenty-five defendants who fall into the following broad categories: 1) the named co-authors of the song; 2) the publishing entities of these co-authors; 3) other entities that allegedly own copyrights in the song; and 4) entities involved in the distribution and exploitation of the song.  This motion was brought by a subset of defendants, and "defendants"

are proven true, he cannot be considered a "co-author" or "co-owner" of the song under the Copyright Act.  ECF No. 217. Defendants also maintain that plaintiff's state law claims are preempted by the Copyright Act and fail as a matter of law.  Id.

Defendants' motion is granted in part and denied in part. Specifically, the Court dismisses plaintiff's state law claims but declines to dismiss his copyright claims.

## BACKGROUND

I. **Factual Background**

The factual background set forth below is drawn from the well-pleaded factual allegations of plaintiff's amended complaint, which are accepted as true for purposes of this motion.  See Wilson v. Dynatone Publ'g Co., 892 F.3d 112, 117 (2d Cir. 2018).

a. **The 2015 Initial, Unfinished Version of "All The Way Up"**

According to the plaintiff, he and defendant Shandel Green (p/k/a Infared) collaborated to "create the initial, unfinished version of the song" over the course of four to five hours in late

---

in this Memorandum and Order refers to the moving defendants and other defendants who joined them.  Those moving defendants are: Joseph Anthony Cartagena, Reminisce Smith Mackie, Remynisce Music, Joey and Ryan Music, Sneaker Addict Touring LLC, Terror Squad Productions, Inc., Terror Squad Entertainment, RNG (Rap's New Generation), Warner Chappell Music, Inc., and Warner-Tamerlane Publishing Corp.  ECF No. 216.  Those joining defendants are: Empire Distribution, Roc Nation LLC, Roc Nation Management LLC, Universal Music Z-Tunes LLC, Songs of Universal Inc., and Edward F. Davadi, Jr.  ECF Nos. 219, 220, 221.  To answer the obvious question of who has not joined or moved, they are: Karim Kharbouch, Shandel Green, Marcello Valenzano, Andre Lyon, Excuse My French Music, Excuse My French Music II, Mr. Green Music, Dade Co. Project Music, Inc., and Po Folks Music.

2015 at Miami's Circle House studio.  AC ¶ 9.

During this studio session, the pair listened to different beats that Infared had brought with him.  Id. ¶ 15.  The collaboration started when Elliott recognized a beat from producer Edward Davadi (p/k/a Edsclusive) and used it to "frame[] out the song."  Id. ¶¶ 15, 16.  While talking to Infared, plaintiff stated that the song they would create would go "'all. the. way. up.' the charts," which Infared repeated when he got into the recording booth.  Id. ¶ 21.  This titular line operates as a "hook"[3] and is repeated throughout the song.  AC ¶¶ 20, 21.

Elliott asserts that he wrote the lyrics, and "created the vocal melody and rhythmic flow" of verse 1 as well as the "pre-hook."  Id. ¶¶ 24, 26.  For verses 2 and 3, Elliott alleges that he created "the vocal melody and rhythmic flow."  Id. ¶ 32.

Following his session with Infared, plaintiff left the Miami studio with a copy of the unfinished version on a CD.  Id. ¶ 33.  Plaintiff's counsel has since uploaded the unfinished version of the song to YouTube at the following link:

---

[3]    A "hook" "refers to the part of the song intended to 'hook' the listener: a catchy combination of melody, lyrics and rhythm that stays in the listener's head -- something that songwriters from the dawn of time have wanted to achieve." Tom Cole, You Ask, We Answer: What's a Hook?, NPR (October 15, 2010), https://www.npr.org/sections/therecord/2010/10/15/130588663/you-ask-we-answer-what-s-a-hook (last visited Feb. 12, 2025).  For example, in The Beatles' All You Need Is Love, the phrase "All You Need Is Love" is repeated, "followed by 'bah bah bah bah bah bah;' followed by the refrain, 'Love is all you need.' The chorus and refrain become the hook -- the thing you remember." Id. (citation omitted).

https://www.youtube.com/watch?v=8_R1WTXnBM.  Id. ¶¶ 9, 12.

Plaintiff refers to this version of the song as "unfinished," in part because he understood other artists would further develop the song.  While he was in the Circle House studio, plaintiff mentioned to Infared that he "supported the song being shopped to" Joseph Cartagena (p/k/a Fat Joe) and suggested that Karim Kharbouch (p/k/a French Montana) perform the parts that plaintiff had rapped in the initial version.  Id. ¶¶ 14, 25, 29.

**b. The 2016 Finished, Released Version of "All The Way Up"**

In the following months, Fat Joe, French Montana, and other artists added to the song while working on Fat Joe's album Plata O Plomo.  Id. ¶¶ 10, 191.  The finished version of "All The Way Up" was publicly released on March 2, 2016 and is performed by Fat Joe, French Montana, Infared, and Reminisce Smith Mackie (p/k/a Remy Ma).  Id. ¶¶ 8, 10, 40.  The released version has been uploaded to YouTube at the following link: https://www.youtube.com/watch?v=y2ak_oBeC-I.  Id. ¶ 11.

Plaintiff alleges "the unfinished version and released version [of the song] are virtually identical."  Id. ¶ 18.  Both versions include verses, a pre-hook, and a hook.  Id. ¶¶ 17, 18; see also AC, Ex. 1 (Comparison of the Lyrics).  Elliott claims that both versions are "identical in terms of song structure, lyrics, and content," as well as "the musical composition, parts

-4-

of the lyrical composition, the vocal melody, the rhythmic flow of the lyrical cypher, and the sound recording." AC ¶¶ 11, 18.

### c. Elliott's Alleged Contributions To The Released Version

As for the released version, "Plaintiff contends that a great deal of the composition (music and lyrics) and sound recording (as a producer and writer) were created by him." AC ¶ 117. Specifically, Elliott claims that his contributions are reflected in the released version's verses, pre-hook, and hook, as outlined below. Id. ¶¶ 19-34.

**Verses 1 and 4.** Verse 1 is the portion of the song that beings with "Shawty what you want?" and ends with "[G]ot weed, got molly." Id. ¶ 24. Plaintiff claims that he wrote these lyrics, which appear in the released version. Id.; AC, Ex. 1 (Comparison of the Lyrics). Plaintiff also claims that he created "the vocal melody and rhythmic flow of this verse." AC ¶ 24. Verse 1 is repeated as Verse 4 in the released version. Id.

**Verses 2 and 3.** Plaintiff maintains that he created "the vocal melody and rhythmic flow" for Verses 2 and 3. Id. ¶ 32. Plaintiff does not claim to have written the lyrics for these verses, as the lyrics were "completely replaced in the finished version." Id. ¶ 30.

**Pre-Hook.** The pre-hook in the released version repeats the line "Shorty what you want? I got what you need" eight times. Id.

¶¶ 26, 27.  These lyrics are unchanged from the unfinished version.
Id. ¶¶ 26, 28.  Plaintiff claims he wrote these lyrics and "also
created the vocal melody and rhythmic flow."  Id. ¶ 26.

**Hook.**  Plaintiff alleges that the hooks in both versions are
"virtually identical" because "the sound recording from the
initial version's hook is used in the released version."  Id. ¶¶
22, 23.  Infared "raps the hook on the unfinished version and the
released version" of the song.  Id. ¶ 21.

In his amended complaint, plaintiff includes an exhibit
comparing the lyrics of the unfinished and released versions of
the song.  See AC, Ex. 1 (Comparison of the Lyrics).  The Court
reproduces this exhibit below.

| UNFINISHED VERSION OF SONG | RELEASED VERSION OF SONG |
|---|---|
| **HOOK (Infared)** | **HOOK (Infared)** |
| Nothing can stop me | Nothing can stop me |
| I'm all the way up | I'm all the way up |
| All the way up | All the way up |
| I'm all the way up | I'm all the way up |
| I'm all the way up | I'm all the way up |
| Nothin' can stop me | Nothin' can stop me |
| I'm all the way up | I'm all the way up |
| | |
| **VERSE I (Fly Havana)** | **VERSE I (French Montana)** |
| Shawty what you want | Shawty what you want |
| I got what you need | Shawty what you need |
| See we smoking loud | My niggas run game |
| Ya we rolling trees | We ain't never leave |
| In the club going up | Countin' up this money |
| On that Medellin | We ain't never sleep |
| Bring ya girls with you | You got V12 |
| Cause you know I'm with my team | I got 12 V's |
| Pop bottles | Got bottles |
| Got weed | Got weed |
| Got molly | Got molly |
| (I'm all the way up) | (I'm all the way up) |
| | |
| **PRE-HOOK (Fly Havana)** | **PRE-HOOK (French Montana)** |
| Shawty what you want | Shawty what you want |

I got what you need
Shawty what you want
I got what you need
Shawty what you want
I got what you need

**HOOK (Infared)**
I'm all the way up
I'm all the way up
I'm all the way up
I'm all the way up
Nothing can stop me
I'm all the way up
All the way up
All the way up
I'm all the way up
Nothing can stop me
I'm all the way up

**VERSE II (Infared)**
Like a middle finger
If your girl do
Some freaky shit
Then you can bring her
Shawty popped a molly
Took her clothes off
Damn girl
You just a show off
Ain't no two sons
I want three
And if I'm spending money
Then you know she fuckin me
She said I got a big dick
I gotta take it slow
And she never ever seen
No shit like this before because

**PRE-HOOK/HOOK-VARIATION (Infared)**
I'm all the way up
So y'all can stay up
Cause if you ask any body where I live
They point to the Hills and tell you
Go all the way up
Go all the way up

**HOOK (Infared)**
I'm all the way up
I'm all the way up
Nothing can stop me
I'm all the way up

**VERSE III (Spanish Girl)**
Esta en la sima
Esta en la sima
Esta en la sima

I got what you need
Shawty what you want
I got what you need
Shawty what you want
I got what you need

**HOOK (Infared)**
I'm all the way up
I'm all the way up
I'm all the way up
All the way up
Nothing can stop me
I'm all the way up

**VERSE II (Fat Joe)**
For my niggas with Bentley
Coupes and Rolexes
Kicked the bitch out the room
And gave her no breakfast
Had to stash the jewels
These bitches so reckless
Keep my hoes on cruise
I'm talking naughty things
Shorty uptown showin
Off her things
Couldn't take it off
So I gave her um change
She call me top shot-ta
Yeah I keep a few things
Champion sound
Yeah I got a few rings

**PRE-HOOK/HOOK-VARIATION (Fat Joe)**
And I'm all the way up
And you can stay up
And if you ask anybody where I live
They point to the Hills and say
Go all the way up
Go all the way up

**HOOK (Infared)**
I'm all the way up
I'm all the way up
Nothing can stop me
I'm all the way up

**VERSE III (Remy Ma)**
Just left the big house
To a bigger house
Ain't have a girlfriend

Nadia los para
Na mas para arriba
Esta en la sima
Esta en la sima
Esta en la sima
Nadia los para
Na mas para arriba

But the bitch is out
Chanel croc bag
Shit ain't even out
With the gold chains
Himalayan Birkin Cocaine
Lit it up Pac shit
I hit 'em up
I'm talkin color money
Puple Yen and blue Dirham
I got brown Lira
I aint talkin bout Ross bitch
I'm that nigga on
Viagra dick that means

**PRE-HOOK/HOOK-VARIATION (Remy Ma)**
I'm all the way up
And you can stay up
P.O. say I can't get high hopped
Hopped in the helicopter Uber said
Go all the way up
Go all the way up

**HOOK (Infared)**
I'm all the way up
I'm all the way up
Nothing can stop me
I'm all the way up

**VERSE IV (French Montana)[VERSE I REPEATED]**
Shawty what you want
Shawty what you need
My niggas run game
We ain't never leave
Countin' up this money
We ain't never sleep
You got V12
I got 12 V's
Got bottles
Got weed
Got molly
(I'm all the way up)

**PRE-HOOK (French Montana)**
Shawty what you want
Shawty what you need
Shawty what you want
Shawty what you need
Shawty what you want
Shawty what you need

**HOOK (Infared)**
I'm all the way up
I'm all the way up
I'm all the way up

```
I'm all the way up
Nothing can stop me
I'm all the way up
All the way up
I'm all the way up
I'm all the way up
Nothing can stop me
I'm all the way up
```

### d. Following the Song's Release

The released song indeed went "all the way up" the charts, garnering hundreds of millions of views on YouTube, earning Grammy nominations, and achieving "double platinum" status.  AC ¶¶ 1, 107, 191.  Other prominent artists, such as Shawn Carter (p/k/a Jay-Z), David Guetta, and Calvin Cordozar Broadus Jr. (p/k/a Snoop Dogg), would later perform remixes of the song.  Id. ¶¶ 1, 107. However, at no point was plaintiff named as one of the song's authors, owners, or producers in a copyright registration for the song.  Id. ¶¶ 113, 114.

Elliott alleges that he and Fat Joe spoke over the phone on two occasions in early March 2016, shortly after the song was released.  Id. ¶¶ 41, 42.  During the first call, plaintiff asserts that Fat Joe said "he realized that Mr. Elliott had actually written and performed on" the song.  Id. ¶ 41.  On the second call, plaintiff alleges that he told Fat Joe that "he wanted to get paid up front or have publishing going forward," id. ¶ 42.

It is undisputed that in mid-March 2016, following these conversations, Elliott and Fat Joe met at an IHOP in Miami Beach. Id. ¶ 49.  At this meeting, Fat Joe presented Elliott with a "piece

-9-

of paper" and a $5,000 check, which had a memo line that read "write." Id. ¶ 51.  After a short discussion, Elliott signed the "piece of paper" and took the check.  Id. ¶¶ 51, 56-60.

Following the IHOP meeting, plaintiff never received any credit or any further compensation.  Id. ¶ 109.

## II.  Procedural History

At the outset of the case, this Court identified a potentially dispositive and discrete issue: namely, whether plaintiff had relinquished all of his rights by assigning them to Fat Joe in exchange for a payment of $5,000 as defendants contended.  ECF No. 141 at 3:23-4:2.  The resolution of this issue was complicated by the fact that neither plaintiff nor Fat Joe possessed a signed copy of their agreement.  See ECF Nos. 131-1, 131-2, 132-1, 144.

Following extensive, albeit unsuccessful, efforts to locate a signed copy and two rounds of briefing, we granted defendants' motion for summary judgment.  See Elliott v. Cartagena ("Elliott I"), 2020 WL 4432450 (S.D.N.Y. 2020), ECF No. 166; Elliott v. Cartagena ("Elliott II"), 578 F. Supp. 3d 421, 435 (S.D.N.Y. 2022), ECF No. 192, slip op. at *25.  We rejected plaintiff's request for further discovery and ruled that a draft of the agreement was admissible under Federal Rule of Evidence 1003 as a duplicate of the signed "piece of paper."  Elliott II, 578 F. Supp. 3d at 429, slip op. at *7.  We also found that the draft agreement was

-10-

admissible under Federal Rule of Evidence 1004 "as other evidence"
of the original.  Id. at 428, 429, slip op. at *7, 10.  Thus, we
dismissed the plaintiff's copyright claims and state law claims.
Id. at 435, 435 n.8, slip op. at *24, *25, *25 n.8.

The Second Circuit vacated this Court's decisions in Elliott
I and Elliott II.  See Elliott v. Cartagena ("Cartagena"), 84 F.4th
481, 486 (2d Cir. 2023).  Specifically, the Circuit held that there
were "genuine issues as to the trustworthiness of the Draft," such
that this Court should not have admitted the draft agreement as a
duplicate under Rule 1003.  Id. at 490-91.  Further the Circuit
found that the draft agreement was admissible under Rule 1004, but
that summary judgment without the benefit of discovery was not
warranted.  Id. at 491-93.  As for plaintiff's state law claims,
the Second Circuit found that "summary judgment was improper
because genuine disputes of material fact exist as to whether
Elliott validly assigned all of his rights and as to whether any
such assignment precludes all of Elliott's potential claims."  Id.
at 495.  It is worth noting that the Second Circuit's opinion does
not dictate the result on the assignment issue, which can be
addressed following discovery.  Id.

Following the Second Circuit's decision and this Court's
grant of leave to amend, plaintiff filed an amended complaint on
March 15, 2024.  ECF Nos. 203, 205.  Defendants moved to dismiss

the amended complaint, ECF No. 216, and filed a memorandum of law in support of their motion, ECF No. 217 ("Def. Br."), as well as a brief requesting judicial notice of certain Internet materials, ECF No. 218.  Plaintiff opposed defendants' motion to dismiss, ECF No. 222 ("Opp."), and defendants replied in support of their motion, ECF No. 225 ("Reply").

## LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6), a complaint must include "enough facts to state a claim that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007).[4]  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).  A court must accept as true all factual allegations in the complaint and draw all reasonable inferences in plaintiff's favor.  Acticon AG v. China N.E. Petrol. Holdings Ltd., 692 F.3d 34, 37 (2d Cir. 2012).  In evaluating the sufficiency of a complaint, a district court may consider documents that are attached to the complaint, incorporated by reference in the complaint, or otherwise integral

---

[4]     Plaintiff's counsel distorts the familiar 12(b)(6) standard by stating that "a motion to dismiss should be granted only if 'it appears beyond doubt that the plaintiff[s] can prove no set of facts in support of [their] claim[s] which would entitle [them] to relief.'"  Opp. 6 (quoting Weixel v. Bd. of Educ. of City of New York, 287 F.3d 138, 145 (2d Cir. 2002)).  This standard only applies to "pro se complaint[s]."  Weixel, 287 F.3d at 145.

to the complaint.  See DiFolco v. MSNBC Cable L.L.C., 622 F.3d
104, 111 (2d Cir. 2010).

**DISCUSSION**

**I.  Copyright Act Claims**

We begin by addressing plaintiff's claims under the Copyright
Act.  The parties dispute whether and to what extent Elliott's
contributions are entitled to copyright protection.

**a. Definitions Contained in the Copyright Act**

Before we discuss the plaintiff's copyright claims in full,
we first set out various relevant definitions contained in the
Copyright Act and established by caselaw.

A "joint work" is "a work prepared by two or more authors
with the intention that their contributions be merged into
inseparable or interdependent parts of a unitary whole." 17 U.S.C.
§ 101.  In the words of the Second Circuit, this "definition is
really the definition of a work of joint authorship." Childress
v. Taylor, 945 F.2d 500, 505 (2d Cir. 1991) (citing 1 Nimmer on
Copyright § 6.01).  Joint authorship is when two or more
contributors to a work each "(1) made independently copyrightable
contributions to the work; and (2) fully intended to be co-
authors." 16 Casa Duse, LLC v. Merkin, 791 F.3d 247, 255 (2d Cir.
2015) (citation and quotation marks omitted).

A "'derivative work' is a work based upon one or more

preexisting works, such as a . . . musical arrangement, . . . sound recording . . . or any other form in which a work may be recast, transformed, or adapted." 17 U.S.C. § 101. It may include "revisions, annotations, elaborations" and "other modifications" that "represent an original work of authorship." Id.

A "'collective work' is a work, such as a periodical issue, anthology, or encyclopedia, in which a number of contributions, constituting separate and independent works in themselves, are assembled into a collective whole." 17 U.S.C. § 101.

A musical composition consists of "two distinct aspects—music and lyrics." Pickett v. Migos Touring, Inc., 420 F. Supp. 3d 197, 205 (S.D.N.Y. 2019) (citation and quotation marks omitted). "Music" includes "melody, rhythm, and/ or harmony expressed in a system of musical notation[,]" while "lyrics" are the "accompanying words." Copyright Office Circular 56A at 1 ("Copyright Registration of Musical Compositions and Sound Recordings") (available at https://www.copyright.gov/circs/circ56a.pdf).[5] In short, a copyright of a musical composition "protects the generic sound that would necessarily result from any performance of the piece." Reservoir Media Mgmt., Inc. v. Craze Prods., No. 13 Civ. 1847

---

[5] Copyright Office documents "are not binding on courts but are owed deference to the extent they are persuasive." Grant v. Trump, No. 20 Civ. 7103 (JGK), 2024 WL 4179057, at *6 (S.D.N.Y. Sept. 13, 2024) (citing EMI Christian Music Grp., Inc. v. MP3tunes, LLC, 844 F.3d 79, 97 (2d Cir. 2016)).

(GHW), 2015 WL 5692105, at *4 (S.D.N.Y. Sept. 28, 2015) (citation and quotation marks omitted).  "[T]he author of a musical composition is generally the composer, and the lyricist, if any." In re Cellco Partnership, 663 F. Supp. 2d 363, 369 (S.D.N.Y. 2009) (quoting Copyright Office Circular 56A at 1).

A sound recording is the "aggregation of sounds captured in the recording," Reservoir Media, 2015 WL 5692105, at *4 (citation and quotation marks omitted), and the copyright of a sound recording protects "a particular performance of the musical composition." Pickett, 420 F. Supp. 3d at 205 (citation and quotation marks omitted).  "[T]he author of a sound recording is the performer(s) whose performance is fixed, or the record producer who processes the sounds and fixes them in the final recording, or both."  In re Cellco, 663 F. Supp. 2d at 369 (quoting Copyright Office Circular 56A at 1).

### b. Parties' Positions

Plaintiff claims that, pursuant to the Copyright Act, he is the joint author and co-owner of two joint works: the musical composition and sound recording of "All The Way Up."  AC ¶¶ 215-279.  In the alternative, he claims authorship and ownership for his contributions to each work.  Id.

Defendants dispute plaintiff's claims every step of the way. First, they claim that there are not two joint works at issue, but

rather four separate works.  See Def. Br. 6-7; Reply 1-4.  Namely, they assert that what plaintiff characterizes as the "released" versions of the sound recording and composition are separate from the "unfinished" versions of the sound recording and musical composition.  See id.[6]  Next, defendants contend that plaintiff's allegations are insufficient to support a claim of joint authorship over any version of the song.  See Def. Br. 7-14; Reply 4-7. Defendants also assert that the "released" versions are not joint works because they are derivative of the unfinished versions.  See Def. Br. 6-7; Reply 1-4.  Lastly, defendants dispute plaintiff's alternative claims seeking a finding of authorship and ownership even if the works are not considered joint works.  See Def. Br. 13-14.

The Court examines each of defendants' arguments in turn.

### c. Works at Issue

Defendants first contend that, based on the current record, the unfinished and released versions of "All The Way Up" must be analyzed separately.  See Def. Br. 6-7; Reply 1-4.  We agree.

"The copyright law protects each version of a work from the

---

[6]    In their briefing, defendants refer to the "unfinished" versions and the "released" versions as the "Green Work" and "ATWU" respectively.  Def. Br. 1-2.  The Court uses the terms "unfinished" and "released" as those terms appear in plaintiff's amended complaint.

No party disputes that "musical compositions" and "[s]ound recordings . . . are separate works with their own distinct copyrights."  Def. Br. 1 n.1 (quoting In re Cellco, 663 F. Supp. 2d at 368-69).

moment it is fixed in a copy or phonorecord, provided that the author contributed a sufficient amount of original expression to that version."  12 Nimmer on Copyright 512 (2024) (citing 17 U.S.C. §102(a)).  And "where a work is prepared over a period of time, the portion of it that has been fixed at any particular time constitutes the work as of that time."  17 U.S.C. § 101.

Plaintiff alleges that he left the Miami studio with a copy of the unfinished song on a CD after his session with Infared.  AC ¶ 33.  Assuming the truth of this allegation, the unfinished song constitutes the "work as of that time" and is afforded separate copyright protection from the released song.  17 U.S.C. § 101; see also 16 Casa Duse, 791 F.3d at 259-260 (finding "copyright subsists even in" "unedited film footage" as "an early version of the finished product").  For purposes of this opinion, the Court thus analyzes the unfinished musical composition and sound recording (collectively, the "unfinished versions") separately from the released musical composition and sound recording (collectively, the "released versions").

### d. Joint Authorship

Defendants next contend that, even assuming plaintiff's allegations to be true, plaintiff cannot be a joint author of any version of "All The Way Up."  See Def. Br. 7-14; Reply 4-7.

As stated above, two or more contributors are joint authors if each "(1) made independently copyrightable contributions to the work; and (2) fully intended to be co-authors." 16 Casa Duse, 791 F.3d at 255 (citation omitted).  We examine each element in turn.

### i. Independently Copyrightable Contributions

"A contribution to a work is copyrightable if it [A] is independently created by the author and [B] possesses at least some minimal degree of creativity." Maxwood Music Ltd. v. Malakian, 713 F. Supp. 2d 327, 343 (S.D.N.Y. 2010) (citation omitted).  To satisfy the first requirement, one must "actually collaborat[e] in the work's preparation." Weissmann v. Freeman, 868 F.2d 1313, 1318 (2d Cir. 1989) (citation omitted).  For the second requirement, "[t]he requisite level of creativity is extremely low, and '[t]he vast majority of works make the grade quite easily, as they possess some creative spark, no matter how crude[,] humble[,] or obvious it might be.'" Maxwood, 713 F. Supp. 2d at 343-344 (quoting Maurizio v. Goldsmith, 84 F. Supp. 2d 455, 466-67 (S.D.N.Y. 2000), aff'd, 230 F.3d 518 (2d Cir. 2000)) (internal quotation marks omitted).

Plaintiff has sufficiently alleged that his contributions to the unfinished versions are independently copyrightable. Defendants do not contest this point, focusing instead on plaintiff's alleged contributions to the finished versions of the

-18-

song.    See  Def.  Br.  8-11.    Indeed,  plaintiff's  alleged
contributions to the unfinished versions are numerous.  See supra
pp. 2-4.

Similarly,  plaintiff  has  sufficiently  alleged  that  his
contributions  to  the  released  versions  are  independently
copyrightable.  Defendants assert that plaintiff contributed only
"four  basic,  commonplace  phrases  ubiquitous  in  hip-hop  and  rap
music"  to  the  released  versions,  citing  pages  of  case  law
establishing that these phrases are insufficient contributions as
a matter of law.  Def. Br. 1, 8-11; Reply 4-6.  However, defendants'
focus on plaintiff's "lyrical contributions" ignores plaintiff's
other  allegations  about  his  contributions  to  the  released
versions.  Def. Br. 8.  Plaintiff has alleged that he created more
than  just  these  four  phrases.    See  supra  pp. 5-9.    Rather,
plaintiff maintains that he is responsible for creating the "vocal
melody  and  the  rhythmic  flow"  for  the  verses.    AC  ¶¶  24, 32.
Plaintiff  also  claims  that  he  wrote  the  lyrics  of  the  pre-hook,
which  remain  unchanged  from  the  unfinished  version,  and  "created
[its]  vocal  melody  and  rhythmic  flow."    Id.  ¶  26.    He  further
alleges  that  "the  sound  recording  from  [the]  initial  version's
hook  is  used  in  the  released  version."    Id.  ¶  23.    As  such,
plaintiff alleges that a "great deal of the . . . sound recording
(as  a  producer  and  writer)  [was]  created  by  him."    Id.  ¶  117.

Accordingly, we find that, at the motion to dismiss stage, plaintiff has "at least plausibly suggested the requisite amount of contribution" to assert a claim of joint authorship. Membler.com LLC v. Barber, No. 12 Civ. 4941 (JS) (GR), 2013 WL 5348546, at *6 (E.D.N.Y. Sept. 23, 2013).[7]

### ii.  Intent To Be Joint Authors

The parties next dispute whether Elliott was intended to be a joint author of any version of the song. See Def. Br. 11-13; Opp. 11-13; Reply 1, 4-7.

---

[7]    Defendants cite to several copyright infringement cases in urging the Court to closely scrutinize the versions at the pleading stage and determine whether plaintiff's alleged "melody in a rap track, or some unspecified 'lyrical flow'" is independently copyrightable.  Def. Br. 11; Reply 4-6.  Indeed, in a copyright infringement case, "it is entirely appropriate for the district court to consider the similarity between those works in connection with a motion to dismiss." Peter F. Gaito Architecture, LLC v. Simone Dev. Corp., 602 F.3d 57, 64 (2d Cir. 2010).  The Court finds defendants' citations to be readily distinguishable, as this case does not turn on the similarity test used in a copyright infringement case.  See, e.g., Peabody & Co. LLC v. Wayne, No. 22 Civ. 10316 (AT), 2024 WL 552495, at *2-3 (S.D.N.Y. Feb. 12, 2024) (finding at the motion to dismiss stage that plaintiff failed to state a copyright infringement claim, using the "fragmented literal similarity test"); Rose v. Hewson, No. 17 Civ. 1471 (DLC), 2018 WL 626350, at *4 (S.D.N.Y. Jan. 30, 2018) (same); Steele v. Turner Broad. Sys., Inc., 646 F. Supp. 2d 185, 192 (D. Mass. 2009) (deciding at the summary judgment stage that a "common rhyme scheme or structure does not qualify as original expression"); McDonald v. West, 138 F. Supp. 3d 448, 456 (S.D.N.Y. 2015) ("[T]he Court can evaluate issues of substantial similarity [for copyright infringement claims] at the motion to dismiss stage by reviewing the complaint and the works at issue in the case."), aff'd, 669 F. App'x 59 (2d Cir. 2016); Lane v. Knowles-Carter, No. 14 Civ. 6798 (PAE), 2015 WL 6395940, at *4 (S.D.N.Y. Oct. 21, 2015) (same); Peters v. West, 692 F.3d 629, 635 (7th Cir. 2012) (dismissing copyright infringement because the Circuit was "not persuaded that the similarities alleged by Vince P rise to the level of copyright infringement"); Pickett v. Migos Touring, Inc., 420 F. Supp. 3d 197, 206-208 (S.D.N.Y. 2019) (finding at motion to dismiss stage that plaintiff failed to state a copyright infringement claim because "[t]he only similarity between the two works at issue, the lyrics 'walk it like I talk it,' is not original to the author"); Nwosuocha v. Glover, No. 21 Civ. 04047 (VM), 2023 WL 2632158, at *7 (S.D.N.Y. Mar. 24, 2023) (finding "no reasonable jury, properly instructed, could find that the lyrics of the chorus of Plaintiff's Composition and the chorus of the Challenged Composition are substantially similar"), aff'd, No. 23-703, 2024 WL 2105473 (2d Cir. May 10, 2024).

"To determine whether this mutual intent requirement is satisfied, a court conducts a 'nuanced inquiry into factual indicia of ownership and authorship, such as how a collaborator regarded herself in relation to the work in terms of billing and credit, decisionmaking, and the right to enter into contracts.'" Brooks v. Dash, 852 F. App'x 40, 41 (2d Cir. 2021) (quoting Thomson v. Larson, 147 F.3d 195, 201 (2d Cir. 1998)).  This test "will vary depending on the specific factual circumstances," Caffey v. Cook, 409 F. Supp. 2d 484, 499 (S.D.N.Y. 2006) (citation and quotation marks omitted), and is generally "not susceptible to resolution on a motion to dismiss," Exceller Software Corp. v. Pearson Educ., Inc., No. 10 Civ. 0381 (PGG), 2010 WL 4486944, at *4 (S.D.N.Y. Nov. 9, 2010).

Plaintiff adequately alleges that all of the artists who made contributions to the unfinished song -- created at Miami's Circle House and preserved on a CD -- intended to be joint authors. According to plaintiff, he and Infared collaborated to "create the initial, unfinished version of the song" at Miami's Circle House studio.  AC ¶ 9.  Plaintiff further alleges that "all authors of the composition [and sound recording] intended to be joint authors," AC ¶¶ 219, 235, 251, 268, as all authors "intend[ed] that their contributions be merged into an inseparable and intertwined song," id. ¶ 220.

-21-

In support of these allegations, plaintiff cites an interview
in which Infared spoke about the process of creating "All the Way
Up" and stated that "the songs he creates are collaborations . .
. [and] that independent portions contributed by one songwriter or
another are not important, what is important is 'a collaboration
of talent working together doing one [song].'" Id. ¶¶ 89, 90
(alterations in original).  Though defendants dispute the meaning
of this interview, Reply 4 n.3, the Court finds that plaintiff has
"adequately pled a mutual intention of co-authorship,"
Membler.com, 2013 WL 5348546, at *6, with respect to the unfinished
version.

For the released versions of the song, plaintiff alleges that
"[a]ll authors of the final version of 'All the Way Up' intended
that their contributions be merged into an inseparable song," id.
¶ 110, and that "[a]t all points it was understood that Plaintiff
was to be credited as a writer of 'All The Way Up' the same as
other people who worked on the song," id. ¶ 55.  In support of
this contention, plaintiff points to Fat Joe's actions, including
his statement during a March 2016 telephone call that "he realized
that Mr. Elliott had actually written and performed on" the song,
id. ¶ 41, his subsequent "shout[ing] out" the plaintiff "for his
writing and contributions on the track[,]" and his payment to the
plaintiff with a $5,000 check with a memo line that read "write[,]"

id. ¶¶ 51, 72.  Moreover, "[n]o one has denied that Plaintiff co-authored the song[,]" given that anyone who "listened to the unfinished version[s] . . . realized that Mr. Elliott had actually written and performed on it."  Id. ¶¶ 41, 106; see also id. ¶ 82 (alleging that Edsclusive "having heard the unfinished version, would have known that Plaintiff performed on it"); id. ¶ 95 (alleging that French Montana did not deny plaintiff's co-authorship when confronted).  In the absence of a suggestion that the individuals who were listed as authors had never heard the unfinished versions, plaintiffs' allegations are sufficient to plead mutual intention for the released versions.

Defendants contend that plaintiff has not sufficiently alleged mutual intent because plaintiff was not present at the time of the released version's creation.  Reply 2-3.  But again, defendants fail to consider all of plaintiff's allegations.  Plaintiff allegedly encouraged other artists to work on the song.  He "supported the song being shopped to" Fat Joe and suggested that French Montana perform the parts that plaintiff had rapped in the initial version.  AC ¶¶ 14, 25, 29.  As a result, he alleges that "[a]ll of the joint authors who contributed to the song intended that their contributions be merged with the later contributions of other artists into a single, inseparable song for release."  Id. ¶ 34.

"Given this record and the standard applicable to a motion to dismiss, this Court cannot rule as a matter of law that . . . the parties are not joint authors." <u>Exceller</u>, 2010 WL 4486944, at *5; <u>see also</u> <u>White v. DistroKid</u>, No. 22 Civ. 2205 (VEC) (GWG), 2024 WL 3195471, at *5 (S.D.N.Y. June 24, 2024) ("[W]e do not definitively resolve the issue [of co-authorship intent] based on the allegations in the amended complaint.").[8]  Thus, plaintiff's allegations are sufficient to support a claim of joint authorship over each version of "All The Way Up."

### e. Joint Works, Derivative Works, and Collective Works

The parties further dispute whether the released versions are joint works, derivative works, or collective works.  Defendants contend that the released versions cannot be joint works and are at most derivative works of the unfinished versions.  <u>See</u> Def. Br. 6-7; Reply 1-4.  Plaintiff disagrees and asserts, without citation, that "[i]f something is not a joint work, then it is a 'collective work.'"  Opp. 10.[9]

---

[8]    Due to this ultimate result, there is no need to address plaintiff's Rule 12(g) and unclean hands arguments, Opp. 14-15, 19-20, nor must we consider defendants' arguments as to credit and revision of Copyright Office records, Def. Br. 14-15.

[9]    Both parties incorrectly presume that a work can only occupy one status at a time.  However, it is possible for one work to be both joint and derivative.  <u>See</u> <u>Greene v. Ablon</u>, 794 F.3d 133, 153 (1st Cir. 2015) (finding that a work entitled <u>Treating Explosive Kids</u> "may be both joint and derivative"); <u>see also</u> 1 Nimmer on Copyright §§ 3.08, 6.05 (collecting examples of how "[o]ne and the same production . . . can occupy" multiple statuses and discussing the "perils of taxonomy"); 17 U.S.C. § 101 (defining statuses).

Plaintiff asserts that each version of the song is a joint work. As stated previously, a "joint work" is "a work prepared by two or more authors with the intention that their contributions be merged into inseparable or interdependent parts of a unitary whole." 17 U.S.C. § 101. In the words of the Second Circuit, this "definition is really the definition of a work of joint authorship." Childress, 945 F.2d at 505 (citation omitted). Since plaintiff has sufficiently alleged that he is a joint author of each version of the song, supra pp. 17-24, plaintiff has also plausibly alleged that each version is a joint work.[10]

While defendants may ultimately be correct that the released versions of the song are derivative of the unfinished versions, this argument is premature at the motion to dismiss stage. See, e.g., Woods v. Bourne Co., 60 F.3d 978, 991 (2d Cir. 1995) ("To determine whether a work is sufficiently original to be a derivative work, the judge in a bench trial must make findings of fact based upon a comparison of two works."); Automated Mgmt. Sys., Inc. v. Rappaport Hertz Cherson Rosenthal, P.C., No. 16 Civ. 4762 (LTS) (KNF), 2019 WL 111042, at *2 (S.D.N.Y. Jan. 4, 2019) (declining to determine whether software was in fact an original

---

[10]    Notably, "a joint work can be created even if the collaborative efforts of the authors are unequal." Holtzbrinck Pub. Holdings, L.P. v. Vyne Commc'ns, Inc., No. 97 Civ. 1082 (KTD), 2000 WL 502860, at *10 (S.D.N.Y. Apr. 26, 2000); see also Baker v. Robert I. Lappin Charitable Found., 415 F.Supp.2d 473, 487 (S.D.N.Y. 2006) ("equality in quantity of contribution is not required" for a joint work).

work, or an unregistered derivative version, at the motion to dismiss stage); Vargas v. Pfizer, Inc., 418 F. Supp. 2d 369, 372 (S.D.N.Y. 2005) ("Typically, when the originality of a copyrighted work is at issue, it becomes a question of fact for the jury to resolve." (citation and quotation marks omitted)). We thus decline to determine whether the released versions are original, derivative, or collective at the pleading stage.

### f. Co-Ownership of A Joint Work

Similarly, because plaintiff has sufficiently alleged joint authorship, plaintiff has plausibly alleged co-ownership. According to 17 U.S.C. § 201(a), "authors of a joint work are co[-]owners of copyright in the work." See also Holtzbrinck, 2000 WL 502860, at *10 (same). Given our finding that plaintiff has plausibly alleged joint authorship of both the unfinished and released versions of "All The Way Up," supra pp. 17-24, plaintiff has also plausibly alleged co-ownership of the unfinished and released versions of the song.

### g. Plaintiff's Alternative Claims

In the alternative, plaintiff seeks a finding of authorship and ownership for his contributions to each work even if he is not considered a joint author or the works are not considered joint works. AC ¶¶ 215-279. Defendants move to dismiss these alternative claims. See Def. Br. 13-14.

The Court declines to dismiss plaintiff's alternative claims at this preliminary stage.  Assuming arguendo that the song is considered a "collective work" following discovery, then plaintiff could claim authorship over his "separate and independent" contributions.  16 Casa Duse, 791 F.3d at 257.  Alternative claims are allowed to persist in such a scenario.  See, e.g., Polanco v. City of New York, No. 14 Civ. 7986 (NRB), 2018 WL 1804702, at *10 (S.D.N.Y. Mar. 28, 2018) ("Rule 8(d) of the Federal Rules of Civil Procedure explicitly permits a plaintiff to assert alternative claims, even if those claims are internally inconsistent.") (citations omitted).

Alternatively, assuming arguendo that the released versions of the song are considered derivative of the unfinished versions following discovery, see Def. Br. 6-7; Opp. 9-10; Reply 1-4, then plaintiff may still have an ownership interest in the derivative released versions.  The copyright of a derivative or collective work "extends only to the material contributed by the author of such work, as distinguished from the preexisting material employed in the work, and . . . does not affect . . . any copyright protection in the preexisting material."  17 U.S.C. § 103(b); see also Jim Henson Prods., Inc. v. John T. Brady & Assocs., Inc., 867 F. Supp. 175, 185 n.11 (S.D.N.Y. 1994) (recounting legislative history of 1976 Copyright Act to state the same).  Therefore, while

-27-

"joint authorship of the underlying work does not confer any property right in the new work," the "co-author . . . of the previous works" still has "rights . . . in the material used as part of the compilation of the derivative work." <u>Weissmann</u>, 868 F.2d at 1319; <u>see also</u> <u>Brownstein v. Lindsay</u>, 742 F.3d 55, 68 (3d Cir. 2014) (finding that "even if [plaintiff] is not a co-author of . . . the derivative versions[,] . . . he remains the co-author of the underlying work and has an ownership interest in derivative versions . . . to the extent that they incorporate the underlying work."). And, a "joint author must account to his co-author for use of their joint work in a derivative work." <u>Maurizio</u>, 84 F. Supp. 2d at 467.[11]   In this scenario, the extent of plaintiff's ownership would be a "factual question." <u>Brownstein</u>, 742 F.3d at 68. Thus, the Court declines to dismiss plaintiff's alternative claims at the motion to dismiss stage.

* * *

In conclusion, we remind the parties that we have only addressed whether plaintiff has adequately stated causes of action under the Copyright Act.  Determination of whether Elliott's

---

[11]    Defendants state that plaintiff offers a "novel interpretation of 17 U.S.C. § 103(b) . . . that rights in original works provide co-authorship of any derivative works." Reply 3 n.2. We offer no opinion on that issue, but we do note that, consistent with the Second Circuit's holding in <u>Weissmann</u>, co-ownership rights in the original work may provide ownership rights over the underlying "material used as part of . . . the derivative work."  868 F.2d at 1319.

contributions are in fact subject to copyright protection must await discovery.

## II.  State Law Claims

In addition to his claims under the Copyright Act, plaintiff pleads ten state law claims.  AC ¶¶ 280-348.[12]  Defendants maintain that most of these state law claims are preempted by the Copyright Act, Def. Br. 15-18, and, regardless of preemption, that all fail to state a viable claim, id. at 18-21, 22-25.  Defendants also contend that this Court already dismissed some of plaintiff's state claims in Elliott II.  See id. at 21-22.

In response, plaintiff argues that preemption does not apply because his copyright claims are not copyright infringement claims, Opp. 21-22, and, in any event, all are properly pled, id. at 22-24, 26-27.  Further, plaintiff avers that not only did the Second Circuit's opinion in Cartagena vacate our earlier dismissal of the state law claims, but the Circuit affirmatively found them to be viable.  Id. at 22, 24-26.

Two issues must be addressed at the threshold: first, whether the doctrine of law of the case plays any role in resolving this motion and second, whether plaintiff's state law claims can be

---

[12]    These state law claims include: (a) accounting (Count V); (b) constructive trust (Count VI); (c) unjust enrichment (Count VII); (d) quantum meruit (Count VIII); (e) conversion (Count IX); (f) moneys had and received (Count X); (g) breach of fiduciary duties (Count XI); (h) negligence (Count XII); (i) fraud/negligent misrepresentation (Count XIII); and (j) civil conspiracy (Count XIV).  AC ¶¶ 280-348.

preempted by the Copyright Act even if plaintiff did not bring a copyright infringement claim.

### a. Law of the Case

Both parties dispute whether certain state law claims are viable following this Court's decision in Elliott II and the Second Circuit's decision in Cartagena.  See Def. Br. 21-22; Opp. 22, 24-26.  Plainly stated, these earlier opinions have no bearing on the issues currently presented.

First, this Court's dismissal in Elliott II of plaintiff's fraudulent inducement/ negligent misrepresentation, unjust enrichment, quantum meruit, conversion, moneys had and received, negligence, and civil conspiracy claims was premised on the "clear and plain language of the" draft agreement which "assigned [away] all of [Elliott's] rights in the song."  Elliott II, 578 F. Supp. 3d at 434, 435 n.8, slip op. at *22, 25 n.8.  This decision was vacated by the Second Circuit's decision that the draft agreement "was not admissible as a duplicate original," meaning "summary judgment was improper" "as to whether any such assignment precludes all of Elliott's claims."  Cartagena, 84 F.4th at 489, 495.  Thus, Elliott II is no longer good law.  See In re Bernard L. Madoff Inv. Sec. LLC, 721 F.3d 54, 68 (2d Cir. 2013) ("[V]acatur dissipates precedential force.").

Similarly, this Court's dismissal in Elliott II of plaintiff's fiduciary duty, accounting, and equitable trust claims was based in part on the "terms of the agreement." Elliott II, 578 F. Supp. 3d at 435, slip op. at *23-24. Also driving this decision was the Court's analysis that these claims "arise from an unsupported premise: namely, that Fat Joe had a fiduciary relationship with Elliott at the time the contract was signed." Id. Given the Second Circuit's decision that genuine disputes of material fact concerning Elliott's assignment of rights precluded a summary judgment ruling, Cartagena, 84 F.4th at 495, this Court will not rely on Elliott II's dismissal of these claims and will only look to the Elliott II's analysis to the extent it is persuasive. See In re Okura & Co. (Am.), Inc., 249 B.R. 596, 611 n.10 (Bankr. S.D.N.Y. 2000) ("While it may be true that the act of vacating an opinion diminishes its value as binding precedent, it has no effect on the persuasiveness of the decision." (citation omitted)).

Lastly, contrary to plaintiff's contention, the Second Circuit did not "already review[] Plaintiff's allegations regarding Defendants' misrepresentations and [] f[i]nd that they should go[] to discovery." Opp. 4; see also id. at 22, 24 (similar). The Second Circuit's opinion does not mention the word "misrepresentations," let alone find that plaintiff's fraud,

breach of fiduciary duties, and conspiracy claims are sufficiently pled.  Cartagena, 84 F. 4th at 495-96.  Instead, the Second Circuit held that "Elliott's sworn testimony creates a genuine dispute of material fact as to whether Cartagena promised him consideration other than the $5,000 check for any assignment of rights."  Id. at 496.  This is consistent with the Second Circuit's holding that "genuine disputes of material fact exist as to whether Elliott validly assigned all of his rights and as to whether any such assignment precludes all of Elliott's potential claims."  Id. at 495.  Thus, these claims remain subject to dismissal for reasons other than any such assignment.

### b. Copyright Preemption

The second threshold issue is whether the Copyright Act can preempt a state law claim when a plaintiff has not brought a copyright infringement claim.  We find that it can.

One of the goals of the Copyright Act of 1976 was to create a "national, uniform copyright law by broadly pre-empting state statutory and common-law copyright regulation."  Cmty. for Creative Non-Violence v. Reid, 490 U.S. 730, 740 (1989) (citing 17 U.S.C. § 301(a)).  Accordingly, Congress expressly designed a statutory framework of federal copyright preemption in section 301 of the Copyright Act.  See 17 U.S.C. § 301(a).  That provision provides in full:

> On and after January 1, 1978, all legal or equitable
> rights that are equivalent to any of the exclusive rights
> within the general scope of copyright as specified by
> section 106 in works of authorship that are fixed in a
> tangible medium of expression and come within the
> subject matter of copyright as specified by sections 102
> and 103, whether created before or after that date and
> whether published or unpublished, are governed
> exclusively by this title.  Thereafter, no person is
> entitled to any such right or equivalent right in any
> such work under the common law or statutes of any State.

17 U.S.C. § 301(a).

The Second Circuit "has interpreted the statute as directing a two-part analysis for determining whether a state law claim is preempted under § 301."  In re Jackson, 972 F.3d 25, 42 (2d Cir. 2020).  "The first prong of this test is called the 'subject matter requirement,'" Briarpatch Ltd., L.P v. Phoenix Pictures, Inc., 373 F.3d 296, 305 (2d Cir. 2004), and the second prong is called the "'equivalence' or 'general scope' requirement," Jackson, 972 F.3d at 52.

### i. Subject Matter Requirement

Under the first prong of the preemption inquiry, the Court "looks at the work that would be affected by the plaintiff's exercise of a state-created right" to see if the work "'come[s] within the subject matter of copyright as specified by sections 102 and 103.'"  ML Genius Holdings LLC v. Google LLC, No. 20-3113, 2022 WL 710744, at *2 (2d Cir. Mar. 10, 2022) (citation omitted), cert. denied, 143 S. Ct. 2658 (2023).  The type of works covered

-33-

by 17 U.S.C. §§ 102 and 103 include a "literary work[ ]," a "musical work[ ]," a "sound recording[ ]," and "any other category of 'work[ ] of authorship' within the 'subject matter of copyright.'" Jackson, 972 F.3d at 42-43 (citations omitted).

The subject matter requirement is satisfied for all of plaintiff's state law claims. Plaintiff's allegations concern authorship and ownership over a musical composition and sound recording. AC ¶¶ 281, 287, 292, 297, 302-303, 308, 313-314, 318, 334, 343. Both works fall squarely within the subject matter of copyright: Section 102(a)(2) covers "musical works, including any accompanying works" and Section 102(a)(7) covers "sound recordings." 17 U.S.C. § 102.

### ii. Equivalence Requirement

Under the second prong of the preemption inquiry, we look at "the right being asserted" to see if it is "'equivalent to any of the exclusive rights within the general scope of copyright as specified by section 106.'" Jackson, 972 F.3d at 43 (quoting 17 U.S.C. § 301(a)) (emphasis in Jackson). Section 106 of the Copyright Act affords a copyright owner the exclusive rights "'to do and to authorize' the reproduction, distribution, performance, and display of a work, and the creation of derivative works based on a work." Id. (quoting 17 U.S.C. § 106). Accordingly, for preemption to apply, "the state law claim must involve acts of

reproduction, adaptation, performance, distribution, or display."
Briarpatch, 373 F.3d at 305.[13]

This Court must assess each state law claim individually to
determine whether this prong has been satisfied.  "When analyzing
the [equivalence] requirement, courts often look to the precise
elements of the cause of action brought under state law and compare
them to the elements that must be pled to bring a comparable claim
under the Copyright Act."  Melendez v. Sirius XM Radio, Inc., 50
F.4th 294, 307 (2d Cir. 2022).  And while the "existence of an
extra element needed to bring a claim under state law may weigh
against preemption," id., the "critical inquiry is whether such
extra elements of the state law claim beyond what is required for
copyright infringement 'change[ ] the nature of the action so that
it is qualitatively different from a copyright infringement
claim.'"  Jackson, 972 F.3d at 43-44 (emphasis in original)
(citation omitted).

Notably, the equivalence requirement does not require a
copyright infringement claim in the same action.  For example, the
plaintiff in Melendez v. Sirius XM Radio, Inc. brought two claims
alleging the defendant breached his right of publicity under

---

[13]    Defendants improperly seek to broaden Section 106's scope by arguing that
"Section 301 preemption applies to any question of copyright rights, including
authorship and ownership."  Def. Br. 16.  Section 301 preemption extends only
to "the exclusive rights within the general scope of copyright as specified by
section 106."  17 U.S.C. § 301(a).

California law.  50 F.4th at 298.  Nevertheless, the district court found, and the Second Circuit affirmed, that plaintiff's allegations were "not qualitatively different from copyright infringement claims" and were therefore subject to preemption. Id. at 294, 307-08 (citations and quotation marks omitted); see also We Shall Overcome Found. v. Richmond Org., Inc. (TRO Inc.), 221 F. Supp. 3d 396, 411 (S.D.N.Y. 2016) ("For example, a claim for declaratory judgment regarding exclusive rights within the scope of copyright is equivalent to a copyright claim, and thus is preempted." (collecting cases)).

This broad interpretation of the scope of copyright preemption is consistent with Congress' intent.  "Congress, in enacting section 301, . . . deprived the states of the power to 'vest exclusive rights in material that Congress intended to be in the public domain.'"  Forest Park Pictures v. Universal Television Network, Inc., 683 F.3d 424, 430 (2d Cir. 2012) (citations omitted); see also Real Est. Innovations, Inc. v. Houston Ass'n of Realtors, Inc., 422 F. App'x 344, 348-49 (5th Cir. 2011) ("[T]hough perhaps counter-intuitive, it is settled that the absence of a copyright registration does not preclude the application of the doctrine of preemption that exists under the Copyright Act." (citations omitted)).

* * *

In short, the Copyright Act can preempt a state law claim even if the plaintiff did not bring an infringement claim. Thus, the Court will assess each state law claim individually to determine whether preemption applies.

### c. Individual State Law Claims

We start our analysis of plaintiff's state law claims by making the general point that unless plaintiff can establish that his contributions are entitled to copyright protection and that he did not sign away any rights he may have had, Elliott will have few, if any, rights to protect under state law.

With these legal principles in mind, we address each state law claim in turn.

### i. Accounting (Count V)

In Elliott's first state law claim, accounting, he alleges that "Defendants have excluded Plaintiff from receiving any monies related to the exploitation of 'All the Way Up,' [and] must therefore account to their co-author and owner, [] disgorg[ing] the profits he is entitled to." AC ¶ 283.

This claim is plainly preempted by the Copyright Act. It is "only through plaintiff's claim that he did not authorize defendants' distribution, publication, and/or reproduction of the [song] that anyone profiting must account to plaintiff." Levine v. Landy, 832 F. Supp. 2d 176, 193 (N.D.N.Y. 2011) (citing Weber

v. Geffen Recs., Inc., 63 F. Supp. 2d 458, 463 (S.D.N.Y. 1999));
see also Baiul v. NBC Sports, 708 F. App'x 710, 712–13 (2d Cir.
Sept. 7, 2017) (summary order) (affirming district court's
dismissal of accounting, unjust enrichment and conversion claims
as they "seek to vindicate rights that are already protected by
the Copyright Act"); McKenzie-Morris v. V.P. Recs. Retail Outlet,
Inc., No. 22 Civ. 1138 (GHW), 2023 WL 5211054, at *10 (S.D.N.Y.
Aug. 13, 2023) ("[A]s numerous courts in this district have found,
'claims for accounting based on the defendant's alleged
misappropriation and exploitation of a copyright work are
preempted by the Copyright Act.'") (collecting cases),
reconsideration denied, No. 22 Civ. 1138 (GHW), 2023 WL 6603605
(S.D.N.Y. Oct. 7, 2023); D'Arezzo v. Appel, No. 22 Civ. 177 (SDA),
2024 WL 4384027, at *14 (S.D.N.Y. Oct. 3, 2024) (same).

In any event, even if the accounting claim was not preempted,
plaintiff has still failed to state a viable claim.  "To make out
a claim for an accounting under New York law, a plaintiff must
allege (a) that a fiduciary relationship existed between the
parties, and (b) that the defendant breached his or her fiduciary
duty."  Levine, 832 F. Supp. at 192 (citation omitted).

Elliott alleges that as "joint authors[,]" the parties "have
a fiduciary relationship to each other to account for all profits
and monies and share them in parts equal to their share of co-

authorship." AC ¶ 282. But plaintiff's premise is flawed, as "there are traditionally no fiduciary duties owed between joint authors or copyright holders." Mills v. Cottrell, No. 04 Civ. 5562, 2006 WL 3635325, at *5 (S.D.N.Y. Dec. 8, 2006) (citation omitted); see also Gasery v. Kalakuta Sunrise, LLC, 422 F. Supp. 3d 807, 819 (S.D.N.Y. 2019) ("Co-owners of a copyright do not have a fiduciary duty to each other based on that co-ownership itself."); Membler.com, 2013 WL 5348546, at *6 (same).[14]

### ii. Constructive Trust (Count VI)

Plaintiff next claims a constructive trust, alleging that he is "due significant monies from the exploitation of 'All the Way Up,' and those monies are currently in the possession of Defendants.'" AC ¶¶ 286-289.

This claim too is preempted by the Copyright Act. See, e.g., Gary Friedrich Enterprises, LLC v. Marvel Enterprises, Inc., 713

---

[14]    Plaintiff cites numerous cases stating that joint owners have a duty to account to their co-owners, Opp. 23 n.13, and asserts this duty is a "fiduciary dut[y] as numerous courts have recognized," Opp. 26, 26 n.16 (incorrectly directing Court to footnote 14 as opposed to the string-cite in footnote 13). However, contrary to plaintiff's assertions, these cases do not state that joint owners have a fiduciary duty to account to their co-owners. See Davis v. Blige, 505 F.3d 90, 98 (2d Cir. 2007); Thomson, 147 F.3d at 199; BMG Rts. Mgmt., LLC v. Atl. Recording Corp., No. 16 Civ. 7443 (KMW), 2017 WL 5125543, at *2, *3 (S.D.N.Y. Nov. 2, 2017).

In any event, if plaintiff succeeds in proving his claims of joint authorship and co-ownership under the Copyright Act, then plaintiff's co-owners must account to him for any profits. See Davis, 505 F.3d at 98; see also Reach Music Pub., Inc. v. Warner/Chappell Music, Inc., No. 09 Civ. 5580 (LTS), 2009 WL 3496115, at *2 (S.D.N.Y. Oct. 23, 2009) ("A duty to account action under the Copyright Act lies when a co-author exploits the work in question but declines to share royalties with his co-author.").

F. Supp. 2d 215, 222 (S.D.N.Y. 2010) (finding "claim for a constructive trust in connection with unauthorized use of copyrightable work" to be preempted); <u>Bray v. Purple Eagle Ent., Inc.</u>, No. 18 Civ. 5205 (GBD) (SLC), 2024 WL 553961, at *8 (S.D.N.Y. Jan. 3, 2024) (same), <u>report and recommendation adopted</u>, No. 18 Civ. 5205 (GBD) (SLC), 2024 WL 4144063 (S.D.N.Y. Sept. 11, 2024).

This claim also fails as a matter of law. "Under New York law, a party seeking a constructive trust must establish four elements: (1) a confidential or fiduciary relationship; (2) a promise, express or implied; (3) a transfer made in reliance on that promise; and (4) unjust enrichment." <u>Faulkner v. Arista Recs. LLC</u>, 602 F. Supp. 2d 470, 484 (S.D.N.Y. 2009). As stated above, <u>supra</u> pp. 37-39, "there are traditionally no fiduciary duties owed between joint authors or copyright holders." <u>Mills</u>, 2006 WL 3635325, at *5 (citation omitted). Moreover, plaintiff does not plead that any promise was made or that any transfer was made in reliance on a promise. Similarly, there is no unjust enrichment unless plaintiff has a protectible copyright interest.[15]

---

[15]    Plaintiff may have remedies pursuant to the Copyright Act if his contributions are entitled copyright protection. Under the Copyright Act, owners of a joint work are to "be treated generally as tenants in common, with each co[-]owner having an independent right to use or license the use of a work, subject to a duty of accounting to the other co[-]owners for any profits." <u>Davis</u>, 505 F.3d at 98 (citation omitted) (alteration in original). "The presumption of equal ownership may only be altered by an express written agreement in writing signed by both parties." <u>Maxwood</u>, 713 F. Supp. 2d at 343. And if "one joint author registers a copyright individually, the copyright is valid, but the registered owner holds the copyright in constructive trust for

### iii. Unjust Enrichment (Count VII)

For plaintiff's third state law claim, unjust enrichment, he alleges that he is "an author and owner of the composition and sound recording" and "Defendants have earned significant monies from the exploitation of the song, a share of which is properly due to Plaintiff, but which they are improperly retaining." AC ¶¶ 292-293.

The Copyright Act preempts this claim too, as it is based on the unauthorized reproduction, distribution, performance, and display of a copyrightable work. See, e.g., Briarpatch, 373 F.3d at 306-307 (preempting unjust enrichment claim based on adaption of copyrighted works); Ardis Health, LLC v. Nankivell, No. 11 Civ. 5013 (NRB), 2012 WL 5290326, at *10 (S.D.N.Y. Oct. 23, 2012) (preempting unjust enrichment claim based on defendant's public use and display of a website). Again, plaintiff must establish a protected copyright interest before he may pursue a claim for monetary relief.

### iv. Quantum Meruit (Count VIII)

In support of his quantum meruit claim, plaintiff alleges he "authored a song (both composition and sound recording)" and is "entitled to the reasonable value of the services he provided" since "Defendants accepted the services rendered by Plaintiff, as

---

her co-owners." Huurman v. Foster, No. 07 Civ. 9326 (MHD), 2010 WL 2545865, at *11 (S.D.N.Y. June 21, 2010) (citation omitted).

demonstrated by the release and exploitation of the song." AC ¶¶ 297-299. He claims that the "reasonable value of [his] services" is "his fair share [of] the profits of the song." Id. ¶ 299.

The Copyright Act preempts this claim, as it is also premised on the unauthorized reproduction, distribution, performance, and display of a copyrightable work. See, e.g., Ardis Health, 2012 WL 5290326, at *10 (preempting quantum meruit claim based on the defendant's public use and display of a website); Walkie Check Prods., LLC v. ViacomCBS Inc., No. 21 Civ. 1214 (KPF), 2022 WL 2306943, at *12 (S.D.N.Y. June 27, 2022) ("Courts in the Second Circuit have consistently held that unjust enrichment and quantum meruit claims brought under New York law are preempted by the Copyright Act." (collecting cases)).

### v. Conversion (Count IX)

Elliott's conversion claim is based on his "right of possession to his intellectual property (his shares of the song)." AC ¶ 302. He alleges that "[d]efendants, by knowingly and/or intentionally excluding him from sharing in the ownership, authorship, and/or receipt of profits from the song, have dominion over his property and are interfering with his attempts to possess it." Id. ¶ 303.

The Copyright Act preempts this claim as well. Though plaintiff asserts that this claim is based on his "right of

possession," his sought-after remedy--the "profits from the song"--stems from the unauthorized reproduction, distribution, performance, and display of his alleged "intellectual property." AC ¶¶ 302-303. This requires preemption. See, e.g., Miller v. Holtzbrinck Publishers, L.L.C., 377 F. App'x 72, 74 (2d Cir. 2010) (summary order) (preempting conversion claim since "'unauthorized publication is the gravamen of [her] claim'" (citation omitted) (alteration in original)); Avalos v. IAC/Interactivecorp., No. 13 Civ. 8351 (JMF), 2014 WL 5493242, at *7 (S.D.N.Y. Oct. 30, 2014) (preempting conversion claim based on "Defendants' allegedly wrongful commercial exploitation of" photographs); Castro v. Cusack, No. 15 Civ. 6714 (ENV) (LB), 2019 WL 3385218, at *5 (E.D.N.Y. July 26, 2019) (collecting cases stating that conversion and conspiracy claims "are typically preempted by the Copyright Act").

### vi. Moneys Had And Received (Count X)

Plaintiff claims that "all Defendants have received money which belongs to Plaintiff, due to his contributions and/or ownership of the song 'All the Way Up.'" AC ¶ 308.

Again, the Copyright Act preempts Elliott's moneys had and received claim. "The acts through which the Defendants received money belonging to the Plaintiffs are only unjust if the Defendants do not own the relevant portions of a copyright." We Shall

Overcome, 221 F. Supp. 3d at 412.  This is not "a qualitatively different claim than a claim that the Defendants do not possess a copyright."  Id.; see also Saint-Amour v. Richmond Org., Inc., 388 F. Supp. 3d 277, 292 (S.D.N.Y. 2019) (same).

### vii. Breach Of Fiduciary Duties (Count XI)

To state a claim for breach of fiduciary duty, a party must allege "(i) the existence of a fiduciary duty; (ii) a knowing breach of that duty; and (iii) damages resulting therefrom." Johnson v. Nextel Commc'ns, Inc., 660 F.3d 131, 138 (2d Cir. 2011).[16]

Because plaintiff does not plausibly allege the existence of a fiduciary duty, his claim fails as a matter of law.  "[I]n order to survive a motion to dismiss a claim for breach of fiduciary duty, the plaintiff must set forth specific facts constituting the alleged relationship with sufficient particularity to enable the court to determine whether, if true, such facts could give rise to a fiduciary relationship."  Poon v. Roomorama, LLC, No. 09 Civ. 3224 (RMB), 2009 WL 3762115, at *3 (S.D.N.Y. Nov. 10, 2009) (citation and quotation marks omitted).  As discussed earlier, plaintiff's allegation that defendants owe fiduciary duties to him

---

[16]    This claim is not preempted by the Copyright Act.  The "fact that" a breach of fiduciary duty claim "require[s] a finding that there was a breach of fiduciary duty to begin with adds an extra element that makes the claim qualitatively different from a claim of copyright infringement."  Briarpatch, 373 F.3d at 307.

because he is a "co-author[]/author[], co-owner[]/owner[]" cannot carry the day, AC ¶ 313, since "there are traditionally no fiduciary duties owed between joint authors or copyright holders," supra pp. 37-39; Mills, 2006 WL 3635325, at *5 (citation omitted). Further, his allegations that defendants are "attempting to claim his shares and rights of the song as their own, and/or because they are currently in possession of monies that are rightfully his," AC ¶ 313, do not "establish that [the parties] had a fiduciary relationship, as opposed to a typical, arms['] length business relationship." Stadt v. Fox News Network LLC, 719 F. Supp. 2d 312, 323 (S.D.N.Y. 2010) (citation omitted).

### viii. Negligence (Count XII)

Plaintiff's negligence claim states that "all Defendants owed Plaintiff a duty to properly credit him as an author and/or owner" and "[t]hat duty was breached by Defendants when they failed to properly credit and/or compensate him for his contributions to the song." AC ¶¶ 318, 319.

The Copyright Act preempts plaintiff's negligence claim because it is derived from the unauthorized reproduction, distribution, performance, and display of a "worldwide hit song." AC ¶ 322; see, e.g., Gary Friedrich Enterprises, 713 F. Supp. 2d at 227 (dismissing negligence claim which failed to "assert an 'extra element' beyond the rights protected by federal

copyright"); <u>Marvullo v. Gruner & Jahr AG & Co.</u>, No. 98 Civ. 5000
(RLC), 2001 WL 40772, at *7 (S.D.N.Y. Jan. 17, 2001) (preempting
negligence claim where "essential allegation remains that
defendants unlawfully used the" at issue "photographs beyond the
scope of the license").[17]

### ix. Fraud/Negligent Misrepresentation (Count XIII)

Plaintiff asserts a fraud/negligent misrepresentation claim
against <u>eight defendants</u>[18] based on two conversations between
himself and Fat Joe.  AC ¶¶ 325-339.  In the first conversation,
which took place via telephone, Fat Joe allegedly told Elliott
that he was going to get "credit" for writing the song, with "'some
bread' up front and more later," and that Fat Joe would work with
him again in the future.  <u>Id.</u> ¶ 328(a).  In the next conversation,
at the IHOP, Fat Joe allegedly told Elliott that he "was going to
be recognized as a writer on the song, [] that the $5,000 was just
the beginning of the payments," and repeated promises to help

---

[17]    Plaintiff states that this argument was "waived under Rule 12(g)(2),"
Opp. 27, but does not explain how.  Rule 12(g)(2) states that "a party that
makes a motion under this rule must not make another motion under this rule
raising a defense or objection that was available to the party but omitted from
its earlier motion."  Fed. R. Civ. P. 12(g)(2).  Defendants could not have
waived this argument in a previous motion under Rule 12(g)(2) since this is the
first Rule 12 motion brought by defendants.  In any event, when the Court
identified the assignment issue as "controlling," it granted defendants "leave
in reserve [of] all the defendants' rights to move to dismiss, assuming that
the summary judgment motion is not granted."  ECF No. 141 at 3:23-4:2, 6:7-11.

[18]    Besides Fat Joe, plaintiff asserts this claim against Infared, Joey and
Ryan Music, Mr. Green Music, Sneaker Addict Touring LLC, Terror Squad
Production, Inc., Terror Squad Entertainment, and RNG (Rap's New Generation).
AC ¶¶ 325-339.

Elliott in his career.  Id. ¶ 328(b).

To state a claim of fraud, "a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b).  Particularity "requires that the plaintiff '(1) detail the statements (or omissions) that the plaintiff contends are fraudulent, (2) identify the speaker, (3) state where and when the statements (or omissions) were made, and (4) explain why the statements (or omissions) are fraudulent.'"  Duchimaza v. Niagara Bottling, LLC, 619 F. Supp. 3d 395, 416 (S.D.N.Y. 2022) (quoting Eternity Glob. Master Fund Ltd. v. Morgan Guar. Tr. Co. of N.Y., 375 F.3d 168, 187 (2d Cir. 2004)).  "Furthermore, a plaintiff alleging a claim sounding in fraud against multiple defendants under Rule 9(b) must "plead with particularity by setting forth separately the acts complained of by each defendant." Ningbo Prods. Imp. & Exp. Co. v. Eliau, No. 11 Civ. 650 (PKC), 2011 WL 5142756, at *7 (S.D.N.Y. Oct. 31, 2011) (citations and quotation marks omitted) (emphasis in original); see also S.G. v. Bank of China Ltd., No. 23 Civ. 2866 (LAK), 2024 WL 1861158, at *3 (S.D.N.Y. Apr. 29, 2024) (same), aff'd sub nom. S.G. v. Bank of China U.S.A., No. 24-1426, 2024 WL 4891390 (2d Cir. Nov. 26, 2024).

Plaintiff's bare-bones allegations fail to state a claim.  As an initial matter, plaintiff provides only conclusory allegations tying the seven other defendants to the conversations plaintiff

had with Fat Joe.  Dismissal of this claim against the seven other
defendants is thus warranted.  See, e.g., S.G., 2024 WL 1861158,
at *3 (dismissing claim where "allegations do not, among other
necessary things, specify or detail fraudulent statements made by
each of the defendants").

Plaintiff also failed to allege Fat Joe's intent at the time
he made these representations.  "A plaintiff seeking to recover
for such a misrepresentation must show that the promisor either
lacked the intention to perform the promise or specifically
intended not to perform at the time the representation was made."
Segev v. Lynn Univ., Inc., No. 19 Civ. 81252, 2021 WL 2269838, at
*21 (S.D. Fla. Feb. 26, 2021) (citations omitted), report and
recommendation adopted, No. 19-81252-CIV, 2021 WL 1996437 (S.D.
Fla. May 19, 2021).

While we recognize that neither side addressed the issue of
whether the alleged promises by Fat Joe would be bound by the
statute of frauds, it is likely that these promises are barred by
the statute of frauds and are therefore non-actionable.[19]

---

[19]    Florida law applies to the issue of fraud because the alleged conduct
occurred in Florida and plaintiff is located in Florida.  AC ¶ 135; see Prime
Mover Cap. Partners L.P. v. Elixir Gaming Techs., Inc., 898 F. Supp. 2d 673,
694 (S.D.N.Y. 2012) ("The 'law of the jurisdiction where the tort occurred will
generally apply because that jurisdiction has the greatest interest in
regulating behavior within its borders.'") (citations omitted), aff'd, 548 F.
App'x 16 (2d Cir. 2013); Lichtenstein v. Reassure Am. Life Ins. Co., No. 07
Civ. 1653 (DLI) (LB), 2010 WL 1189494, at *1 (E.D.N.Y. Mar. 26, 2010) ("[F]raud
claims are governed by the state in which the injury is deemed to have occurred,
which is usually where the plaintiff is located." (citations and quotation marks
omitted)).

-48-

Florida's statute of frauds "'bars <u>any</u> action 'upon any agreement that is not to be performed within the space of 1 year from the making thereof' and is not in writing." <u>Doe v. Roe</u>, 500 F. Supp. 3d 1319, 1325 (S.D. Fla. 2020) (quoting Fla. Stat. § 725.01) (emphasis in <u>Doe</u>), <u>aff'd,</u> No. 20-14456, 2022 WL 1447378 (11th Cir. May 9, 2022). Moreover, a "false statement amounting to a promise to do something in the future is not actionable fraud, . . . even though the representation was made to induce another to enter into a transaction." <u>Royal Typewriter Co., a Div. of Litton Bus. Sys. v. Xerographic Supplies Corp.</u>, 719 F.2d 1092, 1104 (11th Cir. 1983) (citations omitted).[20]

### x. Civil Conspiracy (Count XIV)

In plaintiff's civil conspiracy claim, Elliott alleges that Fat Joe (and his companies) and Infared (and his companies) "had a corrupt agreement to defraud and deprive Plaintiff of credit, compensation, and ownership." AC ¶ 343. Plaintiff also cites the "numerous underlying torts" of "Fraud, Negligent Misrepresentation, Negligence, Conversion, and/or Moneys Had and Received." <u>Id.</u> ¶ 342.

This claim is "typically preempted by the Copyright Act" because it does not "include any extra elements that make [it]

---

[20] The law is the same under New York law. <u>See</u> <u>Nourieli v. Lemonis</u>, No. 20 Civ. 8233 (JPO), 2021 WL 3475624, at *7 (S.D.N.Y. Aug. 6, 2021) ("[H]azy aspirational statements are not fraud.")

qualitatively different from a claim for co-authorship under the Copyright Act." Castro, 2019 WL 3385218, at *5 (citations and quotation marks omitted); see also Kelley v. Universal Music Grp., No. 14 Civ. 2968 (PAE), 2015 WL 6143737, at *6 (S.D.N.Y. Oct. 19, 2015) (claim alleging "conspiracy to swindle" plaintiff out of earnings was preempted by Copyright Act).

In any event, plaintiff's civil conspiracy claim fails as a matter of law. "New York does not recognize civil conspiracy as an independent cause of action." Reich v. Lopez, 38 F. Supp. 3d 436, 460 (S.D.N.Y. 2014), aff'd, 858 F.3d 55 (2d Cir. 2017). "Allegations of conspiracy are permitted only to connect the actions of separate defendants with an otherwise actionable tort." Generation Next Fashions Ltd. v. JP Morgan Chase Bank, NA., 698 F. Supp. 3d 663, 688 (S.D.N.Y. 2023) (citation and quotation marks omitted). Here, all the underlying torts--"Fraud, Negligent Misrepresentation, Negligence, Conversion, and/or Moneys Had and Received," AC ¶ 342--have been dismissed, supra pp. 42-44, 45-49, thereby requiring dismissal of plaintiff's civil conspiracy claim, see Fisk v. Letterman, 424 F. Supp. 2d 670, 677 (S.D.N.Y. 2006) (dismissing civil conspiracy claim where there was no underlying tort).

## CONCLUSION

For the foregoing reasons, defendants' motion is granted in

part and denied in part.  The Court dismisses the following claims: (a) accounting (Count V); (b) constructive trust (Count VI); (c) unjust enrichment (Count VII); (d) quantum meruit (Count VIII); (e) conversion (Count IX); (f) moneys had and received (Count X); (g) breach of fiduciary duties (Count XI); (h) negligence (Count XII); (i) fraud/negligent misrepresentation (Count XIII); and (j) civil conspiracy (Count XIV).  Further, the defendants' motion to dismiss plaintiff's copyright claims (Counts I-IV) is denied.[21]

The parties are directed to confer and present a discovery schedule to the Court.  The focus at the outset of discovery should be on issues related to the "piece of paper[,]" as plaintiff describes it, and the "contract[,]" as defendants describe it, as well as the related $5,000 payment.

The Clerk of the Court is directed to terminate the motions pending at ECF Nos. 208, 216 and reopen the case on ECF.


Dated:    February 13, 2025
          New York, New York

                                        _____
                                        NAOMI REICE BUCHWALD
                                        UNITED STATES DISTRICT JUDGE

---

[21]    Both parties requested oral argument.  However, given our holding and that our decision is based on clear legal doctrine, the Court determined that oral argument would not be productive.

-51-